Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Andrea Soliz (SBN 243302) *as@mckennonlawgroup.com*
**McKennon Law Group PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff Noelle Riley

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| NOELLE RILEY,<br><br>                    Plaintiff,<br><br>vs.<br><br>THE LINCOLN NATIONAL LIFE INSURANCE COMPANY; LIBERTY LIFE ASSURANCE COMPANY OF BOSTON; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br>_____<br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**<br><br>[Filed Concurrently With:<br>  -  Civil Cover Sheet;<br>  -  Summons; and<br>  -  Certification of Interested Parties] |



**INTRODUCTION**

1.      This case involves a disability claim brought by Plaintiff Noelle Riley ("Plaintiff" or "Ms. Riley"), a 27-year old Senior Contracts Specialist suffering from a debilitating, genetic condition known as Ehlers-Danlos syndrome (EDS).  EDS causes progressive deterioration and degeneration of connective tissue in joints and is characterized by frequent dislocations.  Due to severe, widespread pain caused by these recurrent joint dislocations, Ms. Riley became unable to perform the substantial and material duties of her occupation and was forced to stop working in March 2018.  She was a participant in her employer's welfare benefit plan which provided short-term and long-term disability coverage through Defendants The Lincoln National Life Insurance Company and Liberty Life Assurance Company of Boston (collectively referred to as "Lincoln").  She filed a disability claim with Lincoln which was denied because Lincoln incorrectly determined that Ms. Riley did not meet the policy's definition of disability.  As detailed herein, the evidence unequivocally shows that Ms. Riley was, and is, unable to perform the duties of her own occupation, or any occupation, based on her severe medical condition, and, therefore, Lincoln's denial decision was incorrect, unreasonable and contrary to the medical evidence.

**JURISDICTION AND VENUE**

2.      Ms. Riley brings this action to recover benefits and to enforce and clarify her rights under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B).  This Court has subject-matter jurisdiction over Plaintiff's claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section 1331.

Case No.:



3.      Venue lies in the Central District of California, Southern Division pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Plaintiff resides in this District, some of the alleged breaches occurred in this district and the ERISA-governed plan at issue was administered in part in this district.

## THE PARTIES

4.      Plaintiff is an individual who, at all times relevant to this action, was a citizen of the State of California and a resident of the City of Irvine in Orange County, California.  Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA Section 3(7), 29 U.S.C. Section 1002(7), in the employee welfare benefit plan (the "Plan") established by her former employer United Technologies Corporation ("UTC"), which is at issue in this action.

5.      Lincoln, at all times relevant, administered long-term-disability ("LTD") benefits provided to Plan participants, including Plaintiff, by issuing group policy number GF3-810-258966-016 to UTC.  Lincoln also, at all times relevant, administered short-term-disability ("STD") benefits provided to Plan participants, including Plaintiff, by issuing group policy number 01-258966 to UTC.  Those policies and the Plan promised to pay disability benefits to Plaintiff should she become disabled.  Lincoln has acted as a claims administrator and as an ERISA claims fiduciary of the Plan.

6.      The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sues DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10 when the same are ascertained. DOES 1 through 10 are sued as principals and/or agents, servants, attorneys and employees of said principals, and all the acts performed by them were within the course and scope of their authority and employment.  Plaintiff is informed and

-2-

Case No.:



1    believes and thereupon alleges that each of DOES 1 through 10 is legally

2    responsible in some manner for the events referred to herein, and directly and

3    proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

4

5                              **FACTUAL BACKGROUND**

6

7           7.      In 2015, Ms. Riley began working at UTC as a contracts administrator

8    at its Connecticut location.  In 2016, she was promoted to the position of Senior

9    Contracts Specialist, a customer service role dedicated to coordinating UTC's

10   customers' requests for aircraft repair, and this was her position at the start of her

11   claims for STD and LTD benefits.  As a Senior Contracts Specialist, Ms. Riley's

12   supervisor expected her to work 50 to 60 hours per week, and her job duties required

13   her to spend the vast majority of her time at a computer.  In 2017, Ms. Riley and her

14   husband relocated to Irvine, California, and her supervisor allowed her to continue

15   in her role at UTC by working remotely from California.  She was living in

16   California and working remotely from home at the onset of her disability in March

17   2018.

18          8.      Pursuant to the terms and conditions of the Plan, Ms. Riley is entitled

19   to LTD benefits because she met and continues to meet the LTD policy's operative

20   definition of "Total Disability" and the other conditions necessary to qualify for

21   LTD benefits during the requisite time period.  Under the LTD policy:

22

23          If the Covered Person is eligible for the 24 Month Own Occupation
            benefit, "Disability" or "Disabled" means that during the Elimination
24          Period and the next 24 months of Disability the Covered Person, as a
            result of Injury or Sickness, is unable to perform the Material and
25          Substantial Duties of his Own Occupation, and thereafter, the Covered
            Person is unable to perform, with reasonable continuity, the Material
26          and Substantial Duties of Any Occupation.

27

28



Case No.:

"Material and Substantial Duties" means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

"Own Occupation" means the Covered Person's occupation that he was performing when his Disability or Partial Disability began.  For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.

9.      Under the terms of the LTD policy, the "Benefit Waiting Period" is 180 days, after which Plaintiff is entitled to 66.67% of her monthly pre-disability earnings, which, based on her pre-disability salary, is approximately $3,889 per month.  The monthly benefit amount can be adjusted to account for other benefits received, and is payable until she reaches age 65, the maximum benefit period.

10.     Under the terms of the STD policy, "Disability" means that an employee is unable to perform the material and substantial duties (functions) of his or her current job or a similar job for more than five consecutive workdays solely because of illness, injury, surgery or pregnancy (as certified by his or her physician).  Under the STD policy, the maximum benefit period is 180 days.

11.     Ms. Riley has met both policies' definition of  total disability during all relevant periods because she suffers from EDS, a genetic disorder that causes progressive deterioration and degeneration of connective tissue in joints, the spine, the eyes, the gums, teeth, internal organs and the central nervous system.  EDS is characterized by joint hypermobility, loose/unstable joints that are prone to frequent dislocations and/or subluxations, joint pain, skin hyper-extensibility and tissue fragility.[1]  Although Ms. Riley was born with EDS, she was not diagnosed with it until approximately July 2017.  When she was young, she appeared to be a healthy, mobile individual who seemed unusually prone to accidents.  However, as she aged, physical activity became increasingly challenging for her.  In recent years, her

---

[1] *See https://www.ehlers-danlos.com/what-is-eds/.*

Case No.:



physical restrictions have encompassed basic activities such as walking, sitting, standing, typing, watching or using a computer or television screen and any activities requiring the use of her hands.

12.     In July 2017, due to chronic pain caused by her recurring dislocations, Ms. Riley was referred by her primary care doctor to Khang Lai, D.O., a physician specializing in physical medicine and rehabilitation ("PM&R") who has extensive experience with patients who have EDS.  Dr. Lai recommended regular sessions of physical therapy ("PT") for treatment of Ms. Riley's ongoing pain, and he prescribed pain medications for her such as tramadol (an opioid-like medication), cyclobenzaprine and Tylenol with codeine (an opioid medication).  As needed, Dr. Lai also treats Ms. Riley with steroid injections at areas where she experiences targeted, severe pain.  Additionally, for longer-term treatment, Dr. Lai has ordered radiofrequency ablation ("RFA"), a procedure that uses an electrical current to heat and "burn" an area of nerve tissue to reduce the pain signals the nerve sends to the brain; this procedure must be redone every 8-12 months as the nerve heals. However, when Ms. Riley experiences severe pain, as she does when her shoulder dislocates, and Dr. Lai is unavailable or his office is closed, she goes to an emergency room (ER) for pain treatment.  So that her request at the ER for opioid medication does not raise suspicions that she is simply a drug-seeking patient, Ms. Riley always carries a note written by Dr. Lai to explain that her pain flare-ups are due to a degenerative joint disorder, a degenerative disc disorder and EDS.

13.     As ordered by Dr. Lai, in the summer of 2017, Ms. Riley began attending PT sessions twice per week with Kristen Pitts, a physical therapist who practices in Dr. Lai's medical office.  As a result of the frequent sessions, Ms. Pitts was intimately familiar with Ms. Riley's various painful joints and dislocations.

14.     From July 2017 through March 2018, Ms. Riley struggled to work through her chronic pain and frequent dislocations.  She bought a sit/stand desk for her home office in an effort to alleviate her symptoms.  However, she still suffered



1    from severe pain, particularly in her neck and spine.  Ms. Riley's neck pain would

2    often be so intense that she was unable to hold up her head, and on those days, she

3    would attempt to work while lying in bed, typing with one hand while supporting

4    her neck with the other.

5    15.    On March 7, 2018, Ms. Riley suffered a severe dislocation of her right

6    wrist.  On March 8, 2018, she did not report to work, and she initiated her STD

7    claim with Lincoln based on her wrist dislocation.  On April 4, 2018, claims

8    manager Kimberly Smith approved Ms. Riley's STD claim through May 1, 2018,

9    with Ms. Riley's expected return-to-work date unknown.  On May 25, 2018, Ms.

10   Smith extended her approval through May 10, 2018.  On May 30, 2018, Ms. Smith

11   again extended her approval through June 28, 2018, which would be the last

12   approved extension of Ms. Riley's disability benefits.  Ms. Riley's last day of work

13   was March 7, 2018.  She has not worked for UTC or in any capacity since that time.

14   16.    On March 20, 2018, Ms. Riley was seen by Dr. Lai, who recommended

15   that she remain out of work through May 1, 2018.  As the weeks passed, Ms. Riley's

16   wrist and overall widespread body pain did not improve, so Dr. Lai continued to

17   recommend that she remain out of work, past the initially suggested return-to-work

18   date of May 1, 2018.  Moreover, as Dr. Lai observed that Ms. Riley's ability to heal

19   from her dislocations had improved slightly due to her absence from work, he

20   advised her that full-time employment would likely exacerbate her degeneration so

21   much that continuing work would cause her to become confined to a wheelchair in

22   the near future.

23   17.    The nurse case manager during the initial approval of STD benefits for

24   Ms. Riley was Anna Presutti.  Ms. Presutti recommended approval of Ms. Riley's

25   STD benefits on March 30, 2018.  Ms. Presutti recognized that Ms. Riley had a

26   history of EDS "which has affected her joints and caused symptoms of neck, back

27   and right wrist pain."

28



Case No.:

18.     On May 30, 2018, Ms. Presutti again recommended approval of Ms. Riley's STD benefits.  Ms. Presutti utilized identical language from her first recommendation on March 30, 2018, and also noted that Ms. Riley "ceased work due to ongoing joint/chronic body pain" and that her "ongoing tenderness to mid back muscles continues."  In closing, Ms. Presutti recommended that the disability case manager obtain all updated records from the physical therapist and Dr. Lai in the event that Ms. Riley did not return to work after her two-week follow-up with Dr. Lai on or about June 28, 2018.  However, this time, Ms. Presutti recommended that, once the updated records were obtained, the disability case manager consider a physician-level review with a PM&R specialist.

19.     On May 30, 2018, the same day that Ms. Smith extended Ms. Riley's approval for STD benefits through June 28, 2018, Ms. Smith called Ms. Riley to confirm the extension of STD benefits, and advised her that her claim would be escalated to LTD if she was not cleared to return to work by June 28, 2018.  Ms. Smith also mailed Ms. Riley additional forms that were needed to evaluate her ongoing claim for benefits.  These forms included an Activities Questionnaire Form, a Claimant Information Form and a Claimant Supplementary Statement.

20.     On June 26, 2018, Ms. Riley returned the requested forms to Lincoln. On the first page of her Activities Questionnaire, she reported maximums of being able to sit for only two hours, being able to stand for only 30 minutes and being able to walk for only three hours.  In response to the question regarding the hours per day that she sits, stands and walks, she answered, sit "1 hr," stand "—" (meaning cannot stand) and walk "2 hrs."  Ms. Riley also wrote that she spends 17 hours per day in bed and that she could sit in a car for only two hours.  She also indicated that she spends up to one hour daily and two to three hours weekly on her home computer.

21.     In the section on the second page of her Activities Questionnaire that focused on everyday chores, Ms. Riley detailed that her husband and/or friends performed the more physically intensive tasks of grocery shopping, carrying

Case No.:



groceries into the house, cooking meals and cleaning up after meals.  Beside each of those activities, she responded, respectively, "I don't go," "I can't do this," "I can't chop/stand," "I struggle w/bending."  She wrote that she cleans the bathroom, but usually only once every couple of months.  She also stated that she does the laundry, opens and responds to mail, manages her finances, balances her checkbook, bathes herself, gets dressed and goes up and down the stairs.  However, she annotated the task of "[b]athing yourself" with a comment of "shower chair/dry shampoo when I can't shower."  Next to "[g]oing up and down stairs," she noted, "I need to hold onto something," and beside "[s]tyling your own hair," she wrote "n/a, I have a haircut that doesn't need it daily."

22.   On the third page of her Activities Questionnaire, Ms. Riley responded to a prompt that asked for a description of what prevents her from engaging in any gainful employment: "I am bedridden at least once a week, more if I push myself.  Due to back/neck pain, I spend the majority of my day lying down.  When I am bedridden, I usually have to have my eyes closed and cannot read or watch TV."  When asked for a description of her daily routine, Ms. Riley narrated a day consisting almost entirely of needing to lie down:

> Wake up between 8am & 10am.  Have coffee.  If finances need to be done/bills paid, I do it now.  Lie down on the couch & cross stitch/listen to podcasts.  Sit up to have lunch.  Lie down for an hour.  Go to PT or go for a walk.  Lie down on the couch and watch TV or do cross stitch.  Sit up for dinner.  If I'm feeling okay, go for another walk.  Turn off electronics between 8pm and 9 pm and go to bed to read.  Try to sleep starting at 10pm but I usually can't fall asleep until 12am to 1am.  On a bad day, I wake up at the same time [between 8am and 10am] and ask my husband for ice for my neck.  My pain meds keep me from having to go to the ER.  Usually by evening, I can prop myself up enough to eat dinner.  Then I continue resting in bed until I can sleep.

23.   Ms. Riley's daily routine evidences her inability to sit up for more than a short period of time and that she sits up only due to the necessity of consuming



1    meals.  Based on this description and other information rendered in her Activities

2    Questionnaire, Ms. Riley spends all but a few hours in a day lying down, and the

3    only breaks from this horizontal position are occasional personal finance tasks,

4    eating, medical appointments and short walks.

5          24.     On July 5, 2018, Lincoln escalated Ms. Riley's file to LTD and began

6    its review of her eligibility for LTD benefits.

7          25.     Throughout this time, Ms. Riley consulted regularly with her pain care

8    physician, Dr. Lai, regarding when it would be possible for her to return to work.

9    Although Dr. Lai did not update his specific return-to-work note (that he estimated

10   that Ms. Riley would return to work on May 1, 2018) until her office visit on August

11   20, 2018, this appears to be a clerical error because his August 20 note affirms his

12   continued discussions with Ms. Riley that returning to work would be premature at

13   this time, given her "disabling conditions and dysfunction."  Due to Ms. Riley's

14   constant pain and the evident lack of progress in her joints' healing, Dr. Lai

15   continued to recommend that she maintain her absence from work.

16         26.     On July 10, 2018, disability case manager Veronica White called Ms.

17   Riley to advise her that she would serve as her case manager going forward and to

18   complete an LTD interview.  Ms. White advised Ms. Riley that her LTD claim

19   would be denied because the elimination period had not been met.  However, Ms.

20   Riley never received written confirmation of this determination or a written denial

21   of her LTD claim.

22         27.     On August 7, 2018, following a third review of Ms. Riley's medical

23   records, Ms. Presutti reversed her prior recommendations for the approval of Ms.

24   Riley's STD benefits.  Ms. Presutti's new position was that Ms. Riley simply needed

25   to "use caution and avoid strenuous activity . . . to prevent recurrent dislocations."

26   In support of her new recommendation to deny STD benefits, Ms. Presutti cited

27   "consistent exam findings of normal gait and strength" and no modifications to Ms.

28   Riley's daily pain medication regimen.  Ms. Presutti did not indicate that she had

-9-



considered Ms. Riley's answers on the Activities Questionnaire in assessing the level of Ms. Riley's disability.  It is noteworthy that Lincoln failed to refer Ms. Riley's claim file to a PM&R specialist as recommended by Ms. Presutti in her prior medical records review.

28.     In a letter dated August 8, 2018, Ms. White informed Ms. Riley that her STD benefits beyond June 28, 2018 were not payable because she no longer met the policy's definition of disability.  In a letter to Lincoln dated August 24, 2018, Ms. Riley appealed the denial of her benefits and included updated medical records from Dr. Lai.

29.     In her appeal letter, Ms. Riley included a detailed description of her disabling conditions, which supplements and underscores the statements she had already provided to Lincoln in her Activities Questionnaire.  Ms. Riley wrote about the severe pain she experiences, her need to lie down for most of the day on a regular basis, Dr. Lai's continued recommendation that she not return to work and her inability to communicate effectively when experiencing extreme pain.

30.     Ms. Riley's appeal letter also refuted the suggestion that avoiding heavy lifting would eliminate her dislocations; she described how her shoulder dislocated merely because she stirred pasta.  Additionally, Ms. Riley emphasized that the absence of future scheduled appointments with Dr. Lai was because they had an understanding that Ms. Riley would make appointments on an as-needed basis and that, upon request, Dr. Lai would fit her into his schedule that same day or within a matter of days.

31.     In a letter dated September 20, 2018, Lincoln informed Ms. Riley that she had until February 3, 2019, to submit additional information in support of her appeal.  On October 9, 2018, Ms. Riley informed Lincoln via phone that she had documentation from her new cardiologist, Dennis Sarabi, M.D., Ph.D., to submit, in addition to records of her past 32 visits with Dr. Lai and her physical therapist.  Ms. Riley had consulted with Dr. Sarabi on September 25, 2018 due to a history of



palpitations, tachycardia and increased heart rate when sitting up from a reclining position.  After examining Ms. Riley and conducting an EKG and cardiac exam, Dr. Sarabi concluded that the findings were suggestive of Postural Orthostatic Tachycardia Syndrome ("POTS"), which is a blood-circulation disorder characterized by a heart-rate increase of at least 30 beats per minute in adults when changing from lying to standing, measured during the first 10 minutes of standing.[2] Ms. Riley was advised to mail in the additional medical records.  She clarified with Lincoln that she did not want the appeal decided without all the records from both Dr. Lai and Dr. Sarabi.  On October 30, 2018, Lincoln received records from Dr. Sarabi and, in complete disregard of Ms. Riley's statement to hold off on reviewing the appeal until Dr. Lai's updated records had been received, proceeded to forward her file to appeals review consultant Stephanie Williams.

32.  On November 11, 2018, Ms. Williams referred Ms. Riley's case for a medical review of her disability claim.  On November 13, 2018, Nurse Case Manager Karen Poerschke, R.N., C.C.M., completed a written assessment of Ms. Riley's disability.  Despite Ms. Presutti's concern that a physician specializing in PM&R should review Ms. Riley's claim, there is no evidence that Ms. Poerschke is either a physician or a PM&R specialist.  Indeed, it appears that Ms. Poerschke is lacking completely in the education, training and experience to evaluate Ms. Riley's condition and restrictions/limitations.  Her assessment acknowledged that Ms. Riley suffers from EDS, which can include the symptom of "overly flexible joints that can dislocate . . . and widespread joint pain."  She also wrote, "EDS is not progressive." While EDS itself may not be progressive, Dr. Lai had diagnosed Ms. Riley with degenerative joint disorder, which by its very name is degenerative and therefore progressive.

---

[2] *See https://www.hopkinsmedicine.org/health/conditions-and-diseases/postural-orthostatic-tachycardia-syndrome-pots.*



33.     In the most recent records available to her for review, Ms. Poerschke recognized that Ms. Riley had reported continued, severe pain.  Regarding Ms. Riley's PT sessions, Ms. Poerschke wrote, "The last available PT note is dated 6/11/18 at which [Ms. Riley] reported a migraine with pain from the base of the skull to the right eye and trouble with ankle braces with fibromyalgia flares." Regarding Ms. Riley's last office visit with Dr. Lai, Ms. Poerschke reported, "At the last documented office visit with Dr. Lai 6/28/18 note is made that [Ms. Riley] had a right rotator cuff injury from stirring a pot and dislocated the shoulder (date unknown), reported chronic neck pain and continued widespread body pain."

34.     Ms. Poerschke concluded her Nurse Case Manager Assessment by reviewing generic limitations for persons with EDS.  She wrote, "The nature of EDS is such that [Ms. Riley] must be aware of activities, movements, exercises and equipment to prevent sudden dislocation of joints . . . .  [Ms. Riley] may require time out of work for acute sprains or dislocations, but once recovered the sustained restrictions beyond 6/28/18 are within those described above due to lack of documentation of acute exacerbation or functional deficits."  Ms. Poerschke also noted that an accommodation to change positions was reasonable.  She did not indicate that she considered either Ms. Riley's statements in her Activities Questionnaire or her appeal letter.

35.     On November 20, 2018, Lincoln upheld the denial of Ms. Riley's disability benefits beyond June 28, 2018, based primarily on its unqualified nurse case manager review.  Lincoln upheld the denial in part on the assertion that she could have received reasonable accommodations even though reasonable accommodations were never offered to her and even though the Policy did not have a provision that allowed for denial on this basis under these circumstances.  Due to her disabling conditions, Ms. Riley was unable to return to work, and UTC administratively terminated her employment, effective December 10, 2018.

36.    On December 10, 2018, Ms. Riley, now represented by counsel, sent a letter to Lincoln, giving notice of her appeal of the denial of her STD and LTD claims and informing Lincoln that she intended to submit additional documents in support of her appeal.

37.    By letter dated December 12, 2018, Lincoln informed Ms. Riley's counsel that she had exhausted her administrative remedies with regard to her STD claim, but that a request for an appeal review of her LTD claim would be submitted.

38.    On February 15, 2019, Ms. Riley, through her counsel, submitted an appeal letter to Lincoln regarding the denial of LTD benefits.  Enclosed with the appeal letter was supporting documentation, including Ms. Riley's own personal statement; personal statements from her husband, mother and friend; disability certification letters from Dr. Lai and Ms. Pitts; a letter from Starfleet Service Dogs, Inc. regarding Ms. Riley's service dog; medical records for May 2 through December 14, 2018 from PainCare Medical Group concerning her visits with Dr. Lai and her PT sessions; and records of emergency room visits from Hoag Hospital for June, September and November 2018.

39.    The appeal letter detailed Ms. Riley's medical and occupational history, as well as the procedural history related to her claims for STD and LTD benefits. The letter pointed out that Ms. Riley had never received a written denial of her LTD claim and that the LTD denial violated a myriad of procedural requirements under ERISA and its regulations, including the absence of a written decision, premature denial, arbitrary and capricious reasoning to justify that premature denial and lack of review by a medical expert.  The letter also explained that, insofar as Lincoln based the LTD denial on the same grounds on which it based its termination of Ms. Riley's STD claim, the STD denial was in error because: (1) Ms. Riley's primary treating physician and physical therapist did not agree that Ms. Riley was able to fulfill her job duties as a full-time Senior Contracts Specialist; (2) the assessments by Lincoln's medical reviewers were vague and erroneous, selectively cited language



1    in support of the desired conclusion that Ms. Riley was not disabled, omitted

2    consideration of Ms. Riley's own accounts of her disabling conditions, and

3    suggested that even Lincoln's own nurse reviewers believed that Ms. Riley could

4    not perform the duties of her occupation; (3) there was no substantial evidence that

5    Ms. Riley's disabling conditions improved since Lincoln first approved her claim

6    for STD benefits; and (4) Lincoln had acted with improper bias in denying Ms.

7    Riley's claims for STD and LTD benefits.

8        40.    Ms. Riley's personal statement submitted in support of her appeal of

9    the denial of LTD benefits described how her daily dislocations and severe pain

10   interfered with her ability to perform basic living activities and prohibited computer

11   use and complex thinking:

> I used to have days where I didn't dislocate.  Now, I can't remember the last time I had a dislocation-free day.  My most common dislocations are my SI joints, which cause both sitting, standing, and walking to be extremely painful.  The only position that is at all comfortable is lying on top of an ice pack to numb the pain from that area.  I also have regular wrist dislocations.  When those occur, I have to stop doing any kind of activity with my hand, including computer use, cross-stitch, writing, etc.
> . . .
> The pain from these dislocations also causes a symptom known as "brain fog."  This means that I struggle to form sentences or to find words.  I remember being mortified on a call with a customer right before I began short-term disability because instead of the words "main fuel pump," all I could think of was, "You know, the problem part.  The one that always takes longer than it should."  That is hardly up to the standards that either I or UTC require.  It is also a matter of safety.  I was coordinating the repairs of commercial aviation fleets.  I have to take pain medication daily, usually either tramadol or cyclobenzaprine.  I cannot think clearly when on these medications.  If I take Tylenol with codeine, the strongest opioid medication Dr. Lai has prescribed me for the days when tramadol or cyclobenzaprine are insufficient to relieve my pain, I am incapable of doing anything but sleeping, lying down, or watching television.  No one should be involved in aircraft repair while mentally compromised.  It's too much of a danger.

Case No.:



41.     In addition to Ms. Riley's statement, her husband Tristan Riley, her close friend Larissa Stanton, and her mother Deb Walz also submitted statements in support of Ms. Riley's appeal.  In his statement, Mr. Riley wrote of his wife's progressive deterioration during the years she worked for UTC: "At first it was tiredness after a long day, but it progressively grew to headaches or backaches, and then the inability to sit in an office chair for the full workday."  He stated that due to Ms. Riley's condition, full-time work is not a feasible option.

42.     Ms. Stanton described Ms. Riley's disabling condition as such: "Since Noelle has begun her disability claim, I have seen her health continue to deteriorate. She has received a service dog which helps her.  However, Noelle's best days are far from the norm for a 26-year-old woman.  On a good day, Noelle can join me for a walk and run errands . . . A good day is full of breaks to lie down on the couch with ice packs and painkillers, with braces and KT tape."  Ms. Stanton also corroborated Ms. Riley's current, extreme limitations on computer use: "Noelle has stopped using her desktop computer as any length of time at it, sitting or standing, hurts.  She may use her laptop from her couch sparingly.  I have not seen Noelle able to reliably spend 8 hours doing anything but being bedridden."  She further states:

> I have witnessed the numerous medical alerts Noelle's dog, Antares, performs on her during an outing. It is a common occurrence to have Antares warn Noelle that her heart rate is either about to plunge or spike. Without this warning, Noelle could collapse and hurt herself. With this warning, Noelle can sit down in time to avoid doing so. However, this means Noelle often ends up sitting down out of the way in stores and on the street. During our walks, it is common for Noelle to ask to stop so she can relocate a dislocated or subluxated joint. These are on her good days. Good days can lead to bad ones immediately. Dislocations and subluxations, heart rate spikes and plummets, leave Noelle fatigued beyond what is normal for a 26-year-old as well as in debilitating pain. I have personally witnessed her pay for a good day by needing to spend the next day in bed or in the ER.



43.    Ms. Walz also recounted Ms. Riley's limited ability to function due to the severe pain she experiences: "Every day, there were times when she experienced neck pain and needed to sit such that her head was supported.  On several occasions, I noticed Noelle struggling to find words for her thoughts because she was in so much pain that she could not think of the words she needed to express herself or communicate."  Ms. Walz observed that Ms. Riley would "stay bedridden for weeks at a time."

44.    Additionally, in their certification letters, Dr. Lai and Ms. Pitts detailed their frequent experiences in treating Ms. Riley for her severe pain and dislocations. Dr. Lai directly and emphatically stated that Ms. Riley, in her current physical condition, is unfit to perform her duties as a Senior Contracts Specialist or that of any other occupation:

> Even with the comforts and accommodations available to her at home as a remote employee, my observation of Ms. Riley's physical health over the last two years have led me to conclude that she cannot sustain a full-time job without inflicting severe and enduring harm to her joint and muscle condition . . . Since Ms. Riley has been out on medical leave, she is able to focus on recuperating from the injuries sustained from multiple dislocations a day.  If Ms. Riley were to return to full-time employment, I am certain that her health will again rapidly deteriorate.  Repeated and constant injuries without adequate time for healing will lead to permanent immobility for Ms. Riley, and full-time work will cause Ms. Riley to both sustain more frequent injuries and prevent her from having enough time for rest and therapy to recuperate.

45.    Ms. Pitts' certification letter echoed Dr. Lai's opinions, and described the severe pain and frequency at which Ms. Riley experiences dislocations, despite the high level of care she already uses in avoiding unnecessary injuries:

> Ms. Riley's symptoms include daily or near-daily joint dislocations and the accompanying excruciating pain.  Such dislocations often send the average person to an emergency room (ER) for a physician to relocate the joint and

Case No.:



administer medications to treat the pain.  Ms. Riley experiences far too many dislocations, and far too frequently, for ER visits to be practicable, never mind financially sustainable . . . There is little Ms. Riley can do to reduce her dislocations, considering that she has come to me for dislocations caused by normal, non-rigorous activities such as stirring pasta, walking, and cross-stitching.  Ms. Riley often comes to me without any knowledge of how or why her thoracic (chest) or neck areas hurt, and frequently, she also reports waking up with a new dislocation or pain, meaning that she dislocates joints in her sleep.  **The fact that Ms. Riley dislocates joints in her sleep means that she can do very little to avoid dislocating her joints**. (Emphasis added).

46.    These letters, along with the various medical records and other documents contained in Ms. Riley's claim file with Lincoln, mandated the conclusion that Ms. Riley suffered disabling daily joint dislocations and extreme pain that prevented her from being able to perform the duties of her full-time role as a Senior Contracts Specialist at UTC or any other occupation.

47.    On March 14, 2019, despite the irrefutable evidence supporting Ms. Riley's total disability, Lincoln, remarkably, determined that Ms. Riley did not meet the LTD policy's definition of disability, and it upheld its previous denial of LTD benefits.  Lincoln based its denial on two deficient and biased paper reviews conducted by its paid physician consultants, as well as on an occupational analysis conducted by its in-house vocational case manager.

48.    The first paper review was conducted by cardiologist Robert Bryg, M.D. on March 7, 2019.  However, Ms. Riley, while suffering from cardiac issues, never claimed that these issues disabled her so this review was wholly unnecessary. In any event, this review was biased and totally inadequate as Dr. Bryg knew that Ms. Riley was seeing a new cardiologist, Dr. Sarabi but rather than contacting Dr. Sarabi who had the most recent medical information on Ms. Riley, he contacted Dr. Daniel Kulick, who did not have updated medical information on Ms. Riley.  His cursory, two-page report was limited to Ms. Riley's cardiac complaints.  He offered no opinion as to her functional impairments related to EDS – which is the basis for



her disability claim – and, in fact, deferred comment on her EDS and joint issues to the appropriate specialists.  In regards to her cardiac condition, he vaguely concluded, without examining or speaking with Ms. Riley, that she had no defined cardiovascular functional impairments.  Importantly, he never specifically concluded that Ms. Riley was capable of performing full-time sedentary work and did not offer an opinion as to whether she was disabled from her other obviously disabling medical conditions.

49.     The second paper review was conducted on March 11, 2019, by Howard Grattan, M.D., a physician specializing in PM&R.  This review was completely inadequate and violated ERISA regulations for a full and fair review. Dr. Grattan was not qualified to perform an evaluation and determine restrictions and limitations. There is no evidence that he has any education, training and experience with the main medical conditions from which Ms. Riley was suffering: frequent dislocations resulting from Ehlers Danlos and autonomic instability. ERISA regulations outlining the requirements for a full and fair review of a participant's claim on appeal provide that "the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment."  29 C.F.R. § 2560.503-1(h)(3)(iii); § 2650.503-1(h)(4).[3]  The fact that he was not competent to give an opinion regarding Ms. Riley's conditions is reflected by his statement that, "I would defer any restrictions and limitations in regards to the claimant's autonomic instability to the appropriate specialty."

_____

[3] The Eighth Circuit has noted that "the administrator's use of an in-house physician rather than a specialist to review a disability claim involving an uncommon disease can be a serious procedural irregularity affecting the administrator's decision."  *Morgan v. UNUM Life Ins. Co. of Am.*, 346 F.3d 1173, 1177 (8th Cir. 2003).  In *Morgan*, the court found that the insurer's decision to deny benefits was not supported by substantial evidence, in part because "[n]othing in the record show[ed] that [the insurer's in-house physician] had any expertise or experience whatsoever in dealing with [the claimant's disease]."  *Id.* at 1177–78.




50.     Despite acknowledging that Ms. Riley's diagnosis of EDS and her complaints of chronic neck pain and widespread whole body pain affect her ability to function, Dr. Grattan opined that Ms. Riley was not completely precluded from sustaining employment with restrictions from a pain medicine/PM&R perspective. Dr. Grattan claimed that Ms. Riley had the capacity to lift, carry, push and pull up to 10 pounds occasionally and up to five pounds frequently; walk and stand combined 30 minutes at one time up to five hours out of an eight-hour day; twist, bend, kneel, crouch, squat and climb stairs occasionally; reach overhead and below the knee occasionally; reach at waist level and below the waist frequently; and finger, handle, feel and grasp for a combined 30 minutes at one time up to five hours out of an eight-hour day.  He stated that sitting was not restricted and that she would require a five- to ten-minute break from standing and walking before resuming this activity again.  He also stated that there were no medication side effects, *which is in direct contradiction to Ms. Riley's statements in her personal narrative that she takes pain medication daily and cannot think clearly when she is on these medications*.  Dr. Grattan also failed to provide any explanation as to how he arrived at his very specific conclusions regarding Ms. Riley's work restrictions and failed to explain how he could reach such conclusions without examining her.  In addition, Dr. Grattan failed to explain how someone with such widespread, crippling pain and who is on various mind-altering medications could work a full-time job.

51.     Dr. Grattan also indicated in his report that he had spoken with Ms. Riley's treating physician, Dr. Lai, on March 7, 2019.  In this peer-to-peer call, **<u>Dr. Lai stated that Ms. Riley was impaired due to EDS and frequent dislocations, and that he did not feel Ms. Riley could work even in a sedentary capacity.</u>** Despite Dr. Lai's statements that Ms. Riley was incapable of even sedentary work, Dr. Grattan concluded – without having examined or spoken with Ms. Riley and in direct contradiction to Dr. Lai's opinion – that Ms. Riley could perform sedentary job functions with the restrictions set forth above.  In a failed attempt to differentiate

Case No.:



his opinion from Dr. Lai's opinion, Dr. Grattan summarily stated that he did not agree with Dr. Lai's impression that Ms. Riley was unable to perform sedentary job functions because the clinical findings were not of the severity to support the level of impairment described.  He did not state why.  This statement ignored the extensive record of dislocations, sprains and severe pain that Ms. Riley suffered on a daily basis and also improperly disregarded the fact that Dr. Lai had treated Ms. Riley in person for almost two years and, consequently, had gained great insight into her medical condition and work restrictions – insight that Dr. Grattan entirely lacked.

52.    Additionally, it does not appear that Dr. Grattan was provided with or reviewed any of the medical records and other supporting documents that were submitted with Ms. Riley's LTD appeal letter.  In his report, he stated that "all of the listed documents have been reviewed however only the pertinent records will be commented on."  He then went on to list medical records from Dr. Lai's office from March 12 through June 28, 2018 and PT records from March 7 through June 11, 2018.  In her LTD appeal letter, Ms. Riley submitted medical records from Dr. Lai through December 7, 2018 and PT records through December 14, 2018.  She also submitted records for ER visits in June, September and November 2018, as well as personal statements from herself, her husband (Tristan Riley), her mother (Deb Walz) and a friend (Larissa Stanton).  Dr. Grattan did not include any of these documents in his list of medical records reviewed.  The fact that Lincoln did not provide Dr. Grattan with Ms. Riley's complete medical file is highly improper and demonstrates that Lincoln failed to provide Ms. Riley with a full and fair review of her claim as mandated by ERISA.  This was critical evidence not provided to or considered by Dr. Grattan.[4]  In addition, because Dr. Grattan's conclusions were

---

[4] An insurer's failure to provide its medical consultants with key medical records is inappropriate and without them, a consultants' opinions are based on incomplete medical information and, thus, are not credible.  *See Spangler v. Lockheed Martin*, 313 F.3d 356, 362 (6th Cir. 2002) (court rejected as inaccurate consultant's opinion

Footnote continues on next page…

Case No.:

based on incomplete information, they are unsound and, therefore, Lincoln never should have relied on them to deny Ms. Riley's claim for benefits.

53.    Dr. Grattan stated that "I would defer any restrictions and limitations in regards to the claimant's autonomic instability to the appropriate specialty," yet Lincoln did not seek out an opinion from a qualified doctor with respect to Plaintiff's autonomic instability medical condition.  Thus, **Lincoln left undetermined by its own consulting physicians a key evaluation of one of the important medical conditions that disabled Plaintiff**.  Not having a consulting physician's opinion on this condition, it was obligated to defer to Plaintiff's physicians' opinions but upheld the denial anyway.

54.    On March 14, 2019, an occupational analysis was conducted by Lincoln's in-house vocational case manager, Lori Ashworth, M.Ed., CRC.  Based on Ms. Ashworth's analysis, Ms. Riley's occupation is most often performed at the sedentary level with frequent sitting, reaching, handling and fingering as well as occasional standing and walking.  The essential duties of Ms. Riley's occupation included processing orders for material or merchandise; writing or typing order forms; entering data into a computer; editing orders received; checking inventory control; and informing customers of unit prices, shipping dates, anticipated delays and any additional information needed by the customers.  In its denial letter, Lincoln stated that it had compared the restrictions offered by Dr. Grattan to the job requirements laid out in Ms. Ashworth's occupational analysis and determined that Ms. Riley did not meet the policy's definition of disability.  Lincoln provided no explanation as to how it had reached its conclusion that Ms. Riley's job functions as set forth in the occupational analysis could be performed within the restrictions offered by Dr. Grattan.  This is especially problematic given the fact that Dr. Grattan concluded that Ms. Riley could finger, handle, feel and grasp combined for only 30

about the claimant's ability to work because MetLife "inexplicabl[y]" failed to give him all the relevant medical records and instead "cherry-picked her file in hopes of obtaining a favorable report").

Case No.:



minutes at a time up to five hours in an eight-hour work day, while the occupational analysis indicated that Ms. Riley's job required frequent reaching, handling and fingering.  In his report, Dr. Grattan described "frequently" as 1/3 to 2/3 of the day, which would translate to 2.67 to 5.33 hours out of an eight-hour work day.  Given Dr. Grattan's restriction of up to five hours of combined fingering and handling, Ms. Riley would not be capable of performing her occupation because, according to Lincoln's own occupational analysis, it requires reaching, handling and fingering up to 5.33 hours per day.  Therefore, Lincoln's reliance on its occupational analysis to deny Ms. Riley's LTD claim was misplaced.

55.     Additionally, it appears that Lincoln failed to consider the entirety of the medical records that Ms. Riley had submitted with her appeal letter when it upheld the denial of her LTD claim.  According to Lincoln's March 14, 2019 denial letter, Ms. Riley's claim file contained only Dr. Lai's medical records from March 7, 2018 through February 26, 2019, PT records from March 7 through June 11, 2018 and records from Ms. Riley's cardiology appointments.  However, with her LTD appeal letter, Ms. Riley had provided Lincoln with additional medical records reflecting PT visits from May 2 through December 14, 2018, as well as records from four ER visits that occurred in June, September and November 2018.  All of these records documented Ms. Riley's continuing complaints of severe pain and her frequent dislocations, and further supported her disability claim.  Lincoln had these records in its possession, yet none of these records are mentioned in its denial letter.  As such, it appears that Lincoln improperly disregarded these records.  This is further evidence that Lincoln flouted its obligations under ERISA and failed to afford Ms. Riley a full and fair review of her claim.

56.     Furthermore, Lincoln makes no mention of and clearly did not consider Ms. Riley's personal statement or the personal statements from Ms. Riley's family and friends submitted with her appeal letter.  These statements detailed Ms. Riley's symptoms and described how her daily dislocations and severe pain interfered with

Case No.:



1   her ability to perform basic living activities.  It was improper for Lincoln to ignore

2   these statements that clearly supported Ms. Riley's claim that she is unable to

3   perform the full-time duties of her own occupation or any occupation.  Failure to

4   consider a claimant's personal statement regarding their disability and their

5   subjective complaints of pain is clear error.[5]

6       57.    As repeatedly demonstrated in her medical records, Ms. Riley cannot

7   work due to her disabling condition.  Ms. Riley's treating physician, Dr. Lai, and her

8   physical therapist, Kristen Pitts, have consistently certified that Ms. Riley's

9   disabling conditions of daily joint dislocations and extreme pain prevent Ms. Riley

10  from sustaining full-time employment.  At the time Lincoln issued its March 14,

11  2019 denial letter, it had in its possession Ms. Riley's appeal letter that further

12  described her physical limitations, including "brain fog" that prevented her from

13  thinking clearly enough to communicate effectively for her customer service role as

14  a Senior Contracts Specialist.  Taken together, the information regarding Ms.

15  Riley's disabling conditions and Dr. Lai's opinion strongly favors a conclusion that

16  Ms. Riley was unable to perform her job duties as Senior Contracts Specialist.

17  Lincoln had this information, was cognizant of this information, yet provided no

18  explanation for why it assigned no weight to this information when it denied Ms.

19  Riley's disability claim.

20      58.    Given that Plaintiff's treating physician's diagnoses were based on

21  multiple in-person examinations and on reviews of objective exam findings, Lincoln

22  had no basis to deny Ms. Riley's claims for STD and LTD benefits.  Indeed, courts

23  have typically afforded greater weight to the opinions of physicians who have

24

25  _____

5   *See Kibel v. Aetna Life Ins. Co.*, 725 F.App'x 475, 478 (9th Cir. 2018) ("the
26  district court and Aetna clearly erred in failing to consider the personal statement
    that Kibel submitted explaining that her fatigue did, in fact, render her totally
27  disabled."); *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 904-07 (9th Cir. 2016)
    (finding that the administrator abused its discretion by failing to consider a
28  claimant's subjective account of pain).

                                              Footnote continues on next page…

-23-                                                               Case No.:



treated the claimant for an allegedly disabling condition for a long period of time.[6]
In addition, the more detail a physician provides concerning the bases for his or her
diagnosis and opinion, the more weight his or her conclusions are afforded.[7]

59.    Plaintiff is informed and believes and thereon alleges that Lincoln has
used its paper reviewers many times with the expectation that they would favor
Lincoln in rendering opinions that Lincoln can rely upon to deny claims.

60.    Furthermore, Lincoln's failure to explain what additional information
was needed to support Plaintiff's claim for benefits was a wrongful failure to engage
with Plaintiff in a "meaningful dialogue." *Salomaa v. Honda Long Term Disability
Plan*, 642 F.3d 666 (9th Cir. 2011) (holding that where the administrator issues a
denial based on absence of medical evidence, in order to satisfy the "meaningful
dialogue" requirement, the administrator is obligated to state in plain language what
additional evidence it needed).  Here, Lincoln failed to explain what sort of evidence

---

[6] *See, e.g., Kibel v. Aetna Life Ins. Co.*, 2015 WL 858751, *7 (C.D. Cal. Feb. 26, 2015) ("The record's great constant is Dr. Andersson: he was a board-certified neurologist that treated Ms. Kibel from her disease's inception, including numerous in-person examinations. Thus, his reports are very credible"); *Hodjati v. Aetna Life Ins.*, 2014 WL 7466977, *14 (C.D. Cal. Dec.29, 2014); *Oldoerp v. Wells Fargo & Company Long Term Disability Plan*, 12 F.Supp.3d 1237, 1255 (N.D. Cal. 2014) ("when an in-person medical examination credibly contradicts a paper-only review conducted by a professional who has never examined the claimant, the in-person review may render more credible conclusions"); *see also Salomaa v. Honda Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (ascribing more weight to the opinions of physicians who personally examined the patient and described plaintiff's inability to work in great detail).
[7] *See, e.g., Carrier v. Aetna Life Ins. Co.*, 2015 WL 4511620, *12 (C.D. Cal. July 24, 2015) ("Nevertheless, the Court finds Dr. Corrado's conclusions sounder than those presented by the peer reviewers.  Many of the opinions rendered by these reviewers are presented in conclusory fashion, making it unclear how they reached such starkly contrasting results from those of Dr. Corrado despite reviewing the same materials"); *Ondersma v. Metro. Life Ins. Co.*, 2007 WL4371422, at *5 (N.D. Cal. Dec. 12, 2007) ("Here, by contrast, the opinion offered by Dr. Dixit is not conclusory in nature.  The basis for his opinion is disclosed.  Specifically, he details particular symptoms from which plaintiff suffers, including symptoms he directly observed or found to exist as a result of his examinations; further, he identifies functional limitations typically resulting from such specified symptoms and explains why plaintiff's symptoms, in particular, would cause her to be so limited"); *Williams v. United Omaha Life Insurance Co.*, 2013 WL 5519525, at *12 (N. D. Ala. Sept. 30, 2013).

Footnote continues on next page…

Case No.:

1  was required from Plaintiff outside of that which she had already provided and what

2  Lincoln had already obtained.

3       61.    Plaintiff's inability to sit for an extended period of time alone compels

4  the conclusion that she is disabled and unable to perform the duties of a sedentary

5  occupation.[8]  Here, Dr. Lai and Ms. Pitts believe that Ms. Riley, in her best current

6  condition, is unable to sit for extended periods of time, and on many days she is

7  unable to sit at all.  Moreover, Ms. Riley's answers in her Activities Questionnaire

8  specifically state that she is only able to sit for two hours per day at most; and, in

9  practice, she sits for only about one hour per day.

10       62.    Lincoln also failed to have any physician examine Ms. Riley in person,

11  even though the Plan permits such an examination.  An independent medical

12  examination or functional capacity evaluation could have proven very useful.  This

13  failure to conduct an in-person examination raises additional questions about the

14  credibility of Dr. Grattan's opinions and the accuracy of Lincoln's benefits denial.[9]

15       63.    Moreover, once a claim has been approved, substantial evidence must

16  support a plan fiduciary's decision to terminate benefits, in light of its initial finding

17  of disability.[10]  Lincoln failed to show any improvement in Plaintiff's condition



18  [8] In *Armani v. Northwestern Mutual Life Insurance Co.*, 840 F.3d 1159 (9th Cir.

19  2016), the Ninth Circuit held that where the claimant's attending physicians agreed
that he could sit for at most four hours in an eight-hour workday, he was

20  unequivocally disabled from performing his own sedentary occupation as a full-time
controller (and from any other sedentary occupation), because sedentary jobs require

21  mostly sitting, generally for at least six hours per day.  *See also Mohamed Ahmed
Mokbel-Aljahmi v. United Omaha Life Insurance Company,* 2017 WL 3700992

22  (August 28, 2017) (Sedentary work will generally involve sitting for at least six
hours out of an eight-hour work day).

23  [9]  *See Shaw v. AT&T*, 795 F.3d 538, 550 (6th Cir. 2015) ("the failure to conduct a
physical examination, where the Plan document gave the plan administrator the right

24  to do so, 'raise[s] questions about the thoroughness and accuracy of the benefits
determination.'"); *see also Schramm v. CNA Fin. Corp. Insured Grp. Ben.*

25  *Program,* 718 F.Supp.2d 1151, 1164 (N.D. Cal. 2010) ("The Court likewise gives
little weight to the opinions of Drs. Marion and Fuchs.  Although they reviewed
plaintiff's medical records, they did not examine her in person.").

26  [10] *See Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871

27  (9th Cir. 2008) ("MetLife had been paying Saffon long-term disability benefits for a
year, which suggests she was already disabled.  In order to find her no longer

28  disabled, one would expect the MRIs to show an improvement, not a lack of
                                         Footnote continues on next page…

Case No.:

since it first approved her claim for STD benefits in April 2018.  There was no evidence that Ms. Riley ever recovered from her wrist pain, frequent dislocations, chest pain, neck pain or back pain.  These issues had not been resolved at the time Lincoln terminated her benefits in August 2018.  The evidence in the file was that her condition was deteriorating.  In fact, on the same day Lincoln deemed was the last payable day for STD benefits (June 28, 2018), Ms. Riley had recently dislocated her shoulder and received a steroid injection to her shoulder on that day.  It is therefore evident that Ms. Riley's condition had not been resolved by June 28, 2018, and that she was still disabled from performing her job duties.  The unresolved nature of Ms. Riley's physical ailments on that date, and the evidence that she continued to receive physical therapy through the entire month of July, undermines any conclusion that Ms. Riley's condition had improved.

64.    Plaintiff has exhausted her administrative remedies as to both her STD and LTD claims based on Lincoln's November 20, 2018 letter denying her STD appeal and its March 14, 2019 letter denying her LTD appeal.  As such, Plaintiff has the right to bring a legal action for benefits under ERISA Section 502(a).

65.    The proper standard of review is de novo.  Lincoln does not have discretionary authority pursuant to California Insurance Code Section 10110.6, and it erred in denying Plaintiff's claim.  California Insurance Code Section 10110.6 states, in relevant part:

_____

degeneration."); *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840 (8th Cir. 2001) ("Nothing in the claims record justified [the administrator's] decision that a change of circumstances warranted termination of the benefits it initially granted."); *Nolan v. Heald College*, 745 F.Supp.2d 916, 936 (N.D. Cal. 2010) (rejecting MetLife's argument that it "was entitled to terminate benefits despite no change in Nolan's condition"); *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("Paul Revere had been paying benefits for some time, which suggests to us that Mr. McOsker was still totally disabled within the meaning of the relevant policy."); *Fifield v. HM Life Ins. Co.*, 900 F.Supp.2d 110, 118-19 (D. N.H. 2012) (rejecting the validity of a disability denial where the insurer "determined that Fifield was not disabled based on the same medical records that they deemed sufficient to support her disability.")

Case No.:



(a) If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.

(b) For purposes of this section, "renewed" means continued in force on or after the policy's anniversary date.

(c) For purposes of this section, the term "discretionary authority" means a policy provision that has the effect of conferring discretion on an insurer or other claim administrator to determine entitlement to benefits or interpret policy language that, in turn, could lead to a deferential standard of review by any reviewing court.

. . .

(g) This section is self-executing. If a life insurance or disability insurance policy, contract, certificate, or agreement contains a provision rendered void and unenforceable by this section, the parties to the policy, contract, certificate, or agreement and the courts shall treat that provision as void and unenforceable.

66.     This section, by its own terms, applies to any policy or agreement that provides "disability insurance coverage" to "any California resident" regardless of where it was offered, issued, delivered or renewed.  Here, as there is no dispute that Plaintiff is a California resident, this section applies to the policies and Plan at issue so long as they were offered, issued, delivered or renewed after the effective date of the statute, which is January 1, 2012, but before Plaintiff's claim accrued.  *See Gonda v. The Permanente Med. Grp., Inc.*, 2014 WL 186354, at *2 (N.D. Cal. Jan. 16, 2014).  Plaintiff's claim accrued no later than August 8, 2018, which is the date on which her claim for benefits was first denied.  *See Grosz–Salomon v. Paul Revere Life Ins.*, 237 F.3d 1154 (9th Cir. 2001) (An ERISA cause of action based on a denial of ERISA benefits accrues at the time benefits are denied.).

Case No.:

67.     Thus, the only issue is whether the Plan was offered, issued, delivered or renewed on or after January 1, 2012, but before August 8, 2018.  The Plan was first offered to Plaintiff in 2016 and renewed every year thereafter.  As such, any grants of discretion that can be deemed to be a part of the Plan are void and unenforceable, and thus the denial of benefits at issue must be reviewed de novo.

68.     When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan.

69.     Regardless of the standard of review that this Court applies, Lincoln reached an incorrect decision, given the ample medical evidence in support of Plaintiff's disability.  Lincoln's denial letters failed to address the overwhelming medical evidence supporting Plaintiff's claim for STD and LTD benefits and improperly ignored a portion of medical records submitted in support of her claims.  Lincoln relied upon biased "paper reviews" of Plaintiff's medical records, did not examine her and failed to engage in a "meaningful dialogue" with Plaintiff regarding what additional medical evidence was needed to support her claim.  Accordingly, Lincoln conducted a biased claims investigation, consistent with its inherent conflict of interest, and failed to provide Plaintiff with a full and fair review of her claim, in violation of ERISA.

70.     Plaintiff is now and at all times relevant has remained "disabled" as defined in the Plan, and has now and at all times relevant convincingly demonstrated her total disability through medical records and other documents, information and correspondence.

### FIRST CAUSE OF ACTION

To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest under ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)

Case No.:



(Plaintiff against Lincoln and Does 1 through 10)

71.　Plaintiff incorporates the previous paragraphs as though fully set forth herein.

72.　ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan and/or to clarify her rights to future benefits under the terms of a plan.

73.　At all times relevant, Plaintiff has been entitled to STD and LTD benefits under the Plan.  By denying Plaintiff's claim for benefits under the Plan, and by related acts and omissions, Lincoln violated, and continues to violate, the terms of the Plan, and Plaintiff's rights thereunder.

74.　Lincoln has failed to follow the claims-processing requirements of ERISA and of the Department of Labor Regulations, and has failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. Section 1133(2).  Thus, even if the Plan vests discretion in Lincoln to make benefit determinations, no deference is warranted with regard to Lincoln's handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

75.　A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. § 1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan.  *See* 29 U.S.C. Section 1104(a)(1).  Under ERISA: (1) a fiduciary must discharge its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a party whose interests are



adverse to the interests of the Plan, its participants or its beneficiaries.  Lincoln's handling of Plaintiff's disability benefit claim falls far short of these standards.

76.     For all the reasons set forth above, the decision to deny disability insurance benefits was arbitrary, capricious, wrongful, unreasonable, irrational, contrary to the evidence, contrary to the terms of the Plan and contrary to law. Lincoln abused its discretion in deciding to deny this claim, as the evidence shows its denial decision to be arbitrary and capricious.  Further, Lincoln's denial decision and related actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008).  Lincoln's denial of Plaintiff's claim constitutes an abuse of discretion, as evidenced by the aforementioned conduct.

77.     As a direct and proximate result of Lincoln's denial of disability benefits, Plaintiff has been deprived of disability benefits from June 29, 2018 to the present, which has caused her to experience undue stress and severe financial hardship.

78.     As a direct and proximate result of the denial of her claim for disability benefits, Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to reimbursement of these fees pursuant to 29 U.S.C. Section 1132(g)(1).

79.     A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and therefore entitled to disability benefits.  Plaintiff seeks the declaration of this Court that she meets the Plan definition of disability as to both STD and LTD benefits and is entitled to those benefits under the Plan.  In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim consistent with the terms of the Plan.

Case No.:





## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1. For all Plan benefits due and owing Plaintiff, including STD and LTD benefits;

2. For costs and reasonable attorneys' fees, pursuant to 29 U.S.C. Section 1132(g);

3. For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred. *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992). Specifically, Plaintiff seeks interest at the rate of 10% per annum, pursuant to California Insurance Code Section 10111.2; and

4. For such other and further relief as this Court deems just and proper.

Dated:  November 13, 2019          McKENNON LAW GROUP PC

                                   By: _____
                                        ROBERT J. McKENNON
                                        ANDREA SOLIZ
                                        Attorneys for Plaintiff Noelle Riley

Case No.: